UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCRIPPS HEALTH,<br><br>      Plaintiff,<br><br>v.<br><br>NAUTILUS INSURANCE COMPANY;<br>and DOES 1–20, inclusive,<br><br>      Defendant. | Case No.: 21-cv-01634-AJB-VET<br><br>**ORDER:**<br><br>**(1) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; and**<br><br>**(2) DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**(Doc. No. 132, 135)** |

   This action for breach of contract and breach of the covenant of good faith and fair dealing is brought by Plaintiff Scripps Health (Scripps). Presently pending before the Court is Defendant Nautilus Insurance Co.'s Motion for Summary Judgment, or alternatively, Partial Summary Judgment (Doc. No. 132), and Scripps' Motion for Partial Summary Judgment (Doc. No. 135). The motions have been fully briefed. (Doc. Nos. 136, 137, 138.) Pursuant to Local Civil Rule 7.1(d)(1), the Court find the motion suitable for adjudication without oral argument, and thus **VACATES** the hearing set for <u>December 12, 2024, at 2:00 p.m</u>. Having carefully considered the Parties' arguments and the law, the Court **GRANTS** Nautilus' Motion for Summary Judgment and **DENIES** Scripps' Motion for Partial Summary Judgment for the reasons set forth below.

## I.    BACKGROUND

### A.    The Nautilus Policy

This case arises out of a first-party mold claim for cleanup costs under a Site-Specific Pollution Liability Policy issued by Defendant Nautilus Insurance Company to Plaintiff Scripps Health, effective from March 2, 2018 to March 2, 2021, under Policy number SSP2025613-10 (the "Policy"). (Doc. No. 132-1 at 8, 11.)[1] The Policy is comprised of a Main Form and Endorsements providing both (1) "liability" or "third-party" coverage, and (2) "first-party" coverage, including Coverage A, at issue here. (Doc. No. 135 at 13.) The Main Form includes coverage provisions, exclusions, and conditions to coverage. (*Id.*) The Endorsement expressly modifies various provisions of the Main Form in that it adds coverage and deletes and replaces Coverage D in the Main Form. (*Id.* at 13–14.)

The Policy provides coverage for numerous Scripps clinics and five acute care hospitals, including Scripps Green Hospital and three buildings on the Scripps Green Campus in La Jolla, California: Geisel Pavilion (formerly known as Anderson Outpatient Clinic and referred to herein as "AOP"), Shiley Pavilion, and MD Anderson Cancer Center. (Doc. No. 132-1 at 8.) Coverage A of the Policy provides First Party Cleanup Costs, with limits of $10,000,000 per "pollution condition," subject to a $100,000 per "pollution condition" self-insured retention. (Declaration of Christina Remolina ("Remolina Decl."), Doc. No. 132-2, ¶ 2; *see generally* Policy, Doc. No. 132-8.) During all pertinent times, Nautilus utilized the services of Berkley Environmental ("Berkley") as its agent and claims administrator. (Complaint, Doc. No. 1-2, ¶ 3.) Berkley handled some or all of Nautilus' claims handling duties with respect to Scripps' claims. (*Id.*)

During the initial communications between Scripps' broker, Alliant Insurance Services ("Alliant"), and Nautilus underwriters in February 2018, Scripps requested that it be allowed to submit a Chubb Application it had already completed. (Doc. No. 132-1 at 11.) Nautilus approved the submission of the Chubb Application in lieu of its own Site-

---

[1] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

Specific Pollution Liability Application, so long as Scripps executed a Warranty Statement. (Doc. No. 132-12, at 3; Deposition of Toby Leung ("Leung Depo."), Doc. No. 132-56, at 3–6.) Thus, on March 2, 2018, Scripps submitted its Chubb Application for the Policy to Berkley through Alliant, which was reviewed by Toby Leung and Dave Gibbs, the underwriters of the Nautilus Policy. (Doc. No. 132-1 at 11; Leung Depo. at 16–19.) Scripps also executed Nautilus' Warranty Statement agreeing that the Chubb Application "shall be deemed to be attached to and made part of the policy, if issued, as if physically attached to the policy" and that "the Company is relying on the information contained in the Application in lieu of my completion of the Company's own application." (Doc. No. 132-14.)

> Scripps' Application for insurance contained the following warranty:
>
> BY SIGNING THIS APPLICATION, THE APPLICANT WARRANTS TO THE INSURER THAT IT AND THE OTHER PARTIES TO THIS INSURANCE WILL STRICTLY FOLLOW ANY WATER INTRUSION, MOLD-RELATED, FUNGI-RELATED OR BACTERIA-RELATED OPERATION AND MAINTENANCE PROCEDURES OR PROTOCOLS, INCLUDING ANY WATER INTRUSION, MOLD-RELATED, FUNGI-RELATED OR BACTERIA-RELATED DUE DILIGENCE PROCEDURES OR PROTOCOLS FOR THE ACQUISITION, LEASE OPERATION, MANAGEMENT OR MAINTENANCE OF ANY PROPERTIES, WHICH WERE PROVIDED TO THE INSURER PRIOR TO THE INCEPTION OF ANY COVERAGE APPLIED FOR HEREIN. THE APPLICANT ACKNOWLEDGES THAT THE INSURER'S AGREEMENT TO PROVIDE MOLD, FUNGI AND/OR LEGIONELLA PNEUMOPHILA COVERAGE AS PART OF THE COVERAGE APPLIED FOR PURSUANT TO THIS APPLICATION IS PREDICATED UPON THE APPLICANT'S AGREEMENT TO PROVIDE THIS WARRANTY.

(Chubb Application, Doc. No. 132-13, at 8.)

As part of the underwriting process, Scripps provided to the underwriter numerous documents regarding its infection control, preventative maintenance, and environmental protocols. (Policy at 56–57.)

///

### B.    Site History of Scripps Green Campus

From 2016 through 2019, there was "growth and discoloration" in the heating, ventilation, and air-conditioning ("HVAC") systems, including but not limited to the air handling units ("AHUs") serving the Scripps Green Campus. (Declaration of Chris Hubbard ("Hubbard Decl."), Doc. No. 132-4, ¶ 4; Declaration of Joseph Palanca, P.E. ("Palanca Decl."), Doc. No. 132-3, ¶ 4.) Thus, Scripps retained American Technologies Inc. ("ATI") to assist with HVAC air handling cleaning. (Deposition of Marcell Seunarine ("Seunarine Depo."), Doc. No. 132-58, at 3–4.) Scripps employee Justin Smiech, a licensed HVAC technician, characterized ATI's work as "remediation" in Scripps internal e-mail communications, (Doc. No. 132-19), and explained that "[a]ny work done is remediation. . . . Remediation to me is a very broad defining word. So for me remediation is rendering of any services performed to take care of an issue[,] be it replacement to a burned up motor as simple as anything to resolve an issue[,]" (Deposition of Justin Smiech ("Smiech Depo."), Doc. No. 132-59, at 8–9). ATI was not retained to perform preventative maintenance of the HVAC systems as that was handled internally by Scripps. (Seunarine Depo. at 7–8.) Chris Hubbard, a Scripps employee as an HVAC technician, states that during this time, mold testing was not done to confirm the presence of mold, and that it was Scripps' practice to not test for mold. (Hubbard Decl. ¶¶ 3–4.)

On May 30, 2019, Scripps received an anonymous complaint about an odor in the Interventional Radiology Department ("IR") in the main hospital, which was investigated by the Joint Commission. (Doc. No. 132-20 at 9.) The cause of the odor was determined to be a dirty coil, which was cleaned by ATI. (Seunarine Depo. at 9.) Although there was no mold testing in the IR HVAC, there was particulate matter on the second filter in the AHU because Scripps was not using anti-microbial filters. (Doc. No. 132-20 at 9.) Thereafter, a full assessment of all AHUs at the Scripps Green Campus was conducted. (*Id.* at 10.) Scripps retained San Diego Tech Building Solutions, Inc. ("SD Tech") to inspect the HVAC system. (Doc. No. 132-1 at 15.) The investigation found that all AHUs at the Scripps Green Campus needed to be "serviced and cleaned." (Deposition of Tina E. Pickett

4

("Pickett Depo."), Doc. No. 132-60, at 12–13.) Between July 22, 2019 to August 30, 2019, Scripps inspected and assessed the condition of all 40 AHUs, and from September 1, 2019 to March 24, 2020, remediated 24 AHUs. (Doc. No. 132-1 at 15.) Scripps did not perform any mold testing in those AHUs to confirm the presence of mold before remediation. (Deposition of Raydel Gomez ("Gomez Depo."), Doc. No. 132-57, at 8.)

### C.    Scripps' Mold Claim

On February 18, 2020, Scripps gave notice for a pollution claim to Nautilus through its broker Alliant, but did not confirm a mold claim. (Doc. No. 132-21 at 2–4.) On March 26, 2020, Ashleigh Lewis, a claim adjuster at Berkley to whom the claim was assigned, sent a reservation of rights letter informing Scripps that the Policy requires that any cleanup of mold or other fungus be conducted pursuant to a Certified Industrial Hygienist's written recommendations prior to any cleanup, and the cleanup must be performed in accordance with those recommendations. (Doc. No. 132-22 at 2, 6.) The letter further states "that no pollution condition has been confirmed at the site and that this claim was submitted as notice of potential circumstances." (*Id.* at 2.)

Scripps retained environmental consultant Forensic Analytical Consulting Services ("FACS") to perform a mold assessment on 14 AHUs because the other 24 AHUs had already been remediated. (Doc. No. 132-1 at 15.) Before the inspection, FACS Certified Industrial Hygienist Megan Canright Racicot met with Scripps employee Justin Smiech and SD Tech owner Alberto Nunez on March 26, 2020 to obtain historical information about the HVAC systems before inspecting and testing 7 AHUs. (*Id.*) She prepared notes of the information she received from Smiech and Nunez about historical mold growth that was remediated by ATI in 2017. (*See* Doc. No. 132-23; Deposition of Megan Canright Racicot ("Racicot Depo."), Doc. No. 132-62, at 3–4, 5–7.) She then inspected and took samples of discoloration in AHUs AC-1, AC-2, AC-3, AC-4, AC-5, and AC-6 in the AOP and AHU-14 in the main hospital, which testing confirmed mold in all 7 AHUs. (Doc. No. 132-24 at 2–5; Racicot Depo. at 8.) On April 8, 2020, FACS issued a report stating mold was detected in all 7 AHUs inspected and tested on March 26, 2020, and identifying

historical mold growth and prior remediation activities of the HVAC systems at Scripps Green Campus. (Doc. No. 132-25 at 4.)

FACS then inspected and tested an additional 7 AHUs (AH-1 and AH-2 in Radiation/Oncology in the MD Anderson Cancer Center and RTU-1, RTU-2, RTU-3, RTU-4, and AHU-1 in the Shiley Pavilion), which was completed on April 7, 2020. (Doc. No. 132-26.) On April 23, 2020, FACS issued a second comprehensive report confirming mold in all 14 AHUs tested, located in four separate buildings, and again identifying historical mold growth and prior remediation activities of the HVAC systems at Scripps Green Campus. (Doc. No. 132-27 at 4.) The final FACS report was reviewed and approved by Scripps Risk Manager, Linda Seibert, before being sent to Nautilus. (Doc. No. 132-28.)

Scripps confirmed its mold claim for 14 AHUs on April 2, 2020, based on FACS mold testing. (Doc. No. 132-29.) Nautilus initially opened Claim No. 2092062, but when it learned that some of the AHUs were located in other covered locations, Nautilus opened three additional claims: Claim Nos. 2092667 (Shiley), 2092669 (AOP), and 2092770 (MD Anderson Cancer Center). (Remolina Decl. ¶ 5; Doc. No. 132-30.)

### D.    Scope of Work Performed by SD Tech

The four buildings at Scripps Green Campus include 40 AHUs and hundreds of linear feet of downstream ductwork from each AHU.[2] (Doc. No. 132-1 at 18.) At issue are 38 AHUs, as there was no remediation completed in the two suites in IR. (*Id.*) Beginning June 2019, SD Tech inspected and remediated all of the AHUs in the main hospital except for AHU-14 before FACS inspected and performed mold testing. (*Id.* at 19.) The SD Tech invoices are for "remediation" and there is no reference of "mold" on any of the assessments or invoices. (*See, e.g.*, Doc. No. 132-36 at 27–28, 34, 39; and Doc. No. 132-37 at 19, 21, 27.) The invoices for "Duct Cleaning" also do not reference "mold" and SD

---

[2] There are 22 AHUs in the main hospital: 14 AHUs (AHU-1 through AHU-14), 6 AC units (AC-01 through AC-6), and 2 AHUs in the Interventional Radiology Suites. (Doc. No. 132-1 at 18.) There are 11 AHUs in the Geisel Pavilion: AOP AC-1 through AC-6, AH-1 through AH-4, and ACE-101. (*Id.*) There are 7 AHUs in the Shiley Pavilion: RTU-1 through RTU-4, AHU-1, AH-1, and AH-2. (*Id.*)

Tech did not perform any mold testing. (Doc. No. 132-38; Deposition of Alberto Nunez ("Nunez Depo."), Doc. No. 132-63, at 6.)

### E.    Nautilus' Pre-Lawsuit Claim Investigation

On April 29, 2020, Nautilus retained independent environmental consultant The Vertex Companies, Inc. ("Vertex") to assist with its investigation of Scripps' mold claim. (Doc. No. 132-39.) After Nautilus received the FACS reports of historical mold growth, Vertex also reviewed the ATI invoices to determine the scope of work performed by ATI. (Doc. No. 132-1 at 19.) Despite the FACS errata, Vertex concluded there was historical mold growth and Scripps had ongoing mold issues in its HVAC systems since 2016. (Doc. No. 132-40 at 7; Doc. No. 132-41.)

Daniel Mondo, a Certified Indoor Environmental ("CIE") specialist with Vertex assigned to the claim, testified that the encapsulant applied by ATI may be used to cover over mold when it cannot be properly remediated or removed. (Deposition of Daniel Mondo, Doc. No. 132-64, at 8, 9.) In reviewing ATI invoices, Mr. Mondo considered the encapsulant, HEPA vacuuming, and cleaning together to be remediation and not system maintenance. (*Id.* at 16–18.) Jamie Miller, another CIE specialist with Vertex assigned to the claim, states Scripps' Risk Managers Mary Gallagher and Linda Seibert disclosed to him that all of the AHUs had previously been remediated for mold. (Deposition of Jamie Miller, Doc. No. 132-65, at 7.) Based on her review of the ATI invoices, Ms. Miller agreed with Mr. Mondo's conclusion that ATI's application of certain products in the AHUs and ductwork were used as a fungicide for mold remediation. (*Id.* at 8–11.)

As part of Nautilus' investigation, Vertex mechanical engineer Rob Ezold traveled to the Scripps Green Campus to inspect the HVAC systems on October 26, 2020. (Deposition of Rob Ezold, Doc. No. 132-66, at 6.) Scripps "made clear to [Vertex] that [Vertex] would not be able to shut down air-handling units, look inside, do sampling, any of those things. So it was a nonintrusive evaluation." (*Id.* at 7.)

After receiving the FACS reports and Notice of Errata, Nautilus requested additional information from Scripps specifically to investigate the work performed by ATI from 2016

7

to 2019. (Doc. No. 132-1 at 20.) In response, Ms. Seibert represented that "no ductwork was cleaned/remediated" by ATI and that there "were no reports completed with any photos" from ATI. (Doc. No. 132-43.) She also reported that "no remediation work was done, just cleaning, filter replacement, and some encapsulation that occurred once the cleaning was performed." (*Id.*) However, ATI produced hundreds of photos in this case, and Nautilus asserts many of these show cleaning of ductwork. (Doc. No. 132-1 at 20 (citing Doc. Nos. 132-16 & 132-18).) Tina Pickett, Scripps Corporate Vice President of Facilities and Support Services, testified that from Scripps' perspective, there is no difference between "clean" and "remediate" as those terms are used "interchangeably." (Pickett Depo. at 10–11.)

### F.    Scripps' HVAC Preventative Maintenance Protocols

According to the Scripps Utility Water Safety Management Plan ("UWSMP"), which is a management plan "designed to control and manage microorganisms in water systems," provided to Nautilus as part of the underwriting process, the scheduling and cleaning of the AHU coils and condensate drainage systems were required as follows:

- Coils and drain pans are inspected monthly by in-house personnel for possible leaks, and for proper operation;
- Coils and drain pans are physically cleaned by in-house personnel on a quarterly basis to remove dirt and debris that has accumulated;
- Annually, coils are cleaned and disinfected with an appropriate, approved coil cleaner (Nexgen and U Go Slime), and drain pans are scrubbed and cleaned.

(Doc. No. 132-15 at 47, 60, 63, 75.)

Scripps also represented to Nautilus during the claim investigation that the following HVAC preventative maintenance protocols were being followed as part of its "standard process":

1. Scripps staff visually inspect air handlers on a monthly basis.
2. Scripps staff visually inspects air handlers, filters, and if necessary, ductwork on a quarterly basis.

3. Mechanical Vendor visually inspects air handlers on a quarterly basis to determine if any maintenance is required, such as belt replacement, pulleys working correctly, etc.

4. Environmental Vendor visually inspects air handlers, filters, and ductwork on a quarterly basis for moisture and growth and replaces filters if necessary, and performs any needed cleaning.

(Doc. No. 132-44.)

In November 2018, after the Policy was issued, Scripps Green Hospital was cited by the California Department of Public Health for failure to maintain temperature and humidity within acceptable range in the Operating Room Cardiac Catheterization Labs and Sterile Processing Department. (Doc. No. 132-47 at 16–18.) The deficiency stated the hospital's policy indicates, "Environmental Infection Control is designed to provide strategies for reducing and/or containing environmental sources so that these sources do not contribute to the transmission of infectious organisms. This program includes . . . Air handling system monitoring[.]" (*Id.* at 17–18.)

On or around May 7, 2020, Ms. Pickett presented a PowerPoint presentation that she prepared entitled "Scripps Air Handler and HVAC Unit Status Report" to Scripps executives, which includes the following slide identifying deferred maintenance of the AHUs and buildup of mold in AHUs and ducts:

## Condition of Green Campus Air Handler & HVAC Units

- Green Hospital IR team reported an odor in the suite in May 2019
- Facilities team identified an issue with maintenance of air handlers
- Lack of Engineering leadership oversight in maintaining the air handler units
- Engineers had deferred maintenance on reports
- Air quality and mold concern due to build up in air handlers and ducts in Green Hospital and AOP
- Issue of air quality and maintenance was brought to Tina Pickett's attention in her new role January 17, 2020
- Leadership changes made with local supervisor
- Support deployed to engineering team

(Pickett PowerPoint, Doc. No. 132-46, at 4.)

## II.    LEGAL STANDARD

A court may grant summary judgment when it is demonstrated that there exists no genuine dispute as to any material fact, and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The party seeking summary judgment bears the initial burden of informing a court of the basis for its motion and of identifying the portions of the declarations, pleadings, and discovery that demonstrate an absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if it might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).

When cross-motions for summary judgment are filed by the parties, as here, "[e]ach motion must be considered on its own merits." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). In other words, a court must review the evidence submitted in support of each cross-motion, *id.*, and "giv[e] the nonmoving party in each instance the benefit of all reasonable inferences." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 791 (9th Cir. 2006). That said, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). However, "[b]ald assertions that genuine issues of material fact exist are insufficient." *See Galen v. Cnty. of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007); *see also Day v. Sears Holdings Corp.*, 930 F. Supp. 2d 1146, 1159 (C.D. Cal. 2013) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550

U.S. 372, 380 (2007). Further, even where neither party disputes issues of material fact, the court is still required to analyze the record to determine whether disputed issues of material fact are present. *United States v. Fred A. Arnold, Inc.*, 573 F.2d 605, 606 (9th Cir. 1978); *see also Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1037 n.5 (9th Cir. 2000) ("[T]he district court is responsible for determining whether the requirements of [Rule 56] are met, whether or not the parties believe that they are.").

## III.    REQUEST FOR JUDICIAL NOTICE

Under Federal Rule of Evidence 201, a court may take judicial notice of a fact that is "not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

In support of its motion for summary judgment, Nautilus requests judicial notice of (1) the July 28, 2021 Declaration of Tina Pickett in Support of Defendant Scripps Health's Motion for Summary Judgment, filed in *Jones v. Scripps Health*, Case No. 37-2020-00016806-CU-WT-CTL, San Diego Superior Court; (2) the July 7, 2021 Declaration of Marcia Wylie in Support of Defendant Scripps Health's Motion for Summary Judgment, filed in *Jones v. Scripps Health*; and (3) the January 11, 2022 Declaration of Chris Hubbard in Opposition to Motion for Summary Judgment, filed in *Jones v. Scripps Health*. (Doc. No. 132-6 at 2.) Scripps opposes the request, asserting judicial notice of disputed adjudicative facts are inappropriate and unauthorized by Federal Rule of Evidence 201(b). (Doc. No. 136 at 2.)

Under Federal Rule Civil Procedure 56(c), a court may consider "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" in ruling on a motion for summary judgment. Rule 56(e) provides in part:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may

21-cv-01634-AJB-VET

permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.

Fed. R. Civ. P. 56(e). Nothing in Rule 56(e) supports Scripps' claim that affidavits prepared in connection with another case cannot be used to support a motion for summary judgment. Indeed, the case law suggests otherwise. For example, in *Gulf USA Corp. v. Federal Insurance Co.*, 259 F.3d 1049 (9th Cir. 2001), the Ninth Circuit recognized that "deposition testimony may be used by or against a party on summary judgment regardless of whether the testimony was taken in a separate proceeding." 259 F.3d at 1056; *see Campbell v. Nat'l Passenger R. Corp.*, No. C05-05434 MJJ, 2008 WL 930992, at *14–15 (N.D. Cal. Apr. 3, 2008) (overruling evidentiary objection of the plaintiff's use of "declarations of witnesses that were taken for the purposes of a different lawsuit"); *Roberson v. Bates*, No. CIV S-04-0772 DFL KJM P, 2006 WL 1629076, at *3 (E.D. Cal. June 9, 2006) (holding declarations generated during discovery or in the summary judgment stage of a separate proceeding may be considered under Rule 56(e)).

Accordingly, the Court **GRANTS** Nautilus' request for judicial notice.

## IV. EVIDENTIARY OBJECTION

For a motion for summary judgment, "a party does not necessarily have to produce evidence in a form that would be admissible at trial[.]" *See Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001). "Rule 56[(c)] requires only that evidence 'would be admissible', not that it presently be admissible." *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006). Thus, "[t]he focus is on the admissibility of the evidence's contents, not its form." *Estate of Hernandez-Rojas ex rel. Hernandez v. United States*, 62 F. Supp. 3d 1169, 1174 (S.D. Cal. 2014) (citing *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004)); *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (same). And while a court will consider a party's evidentiary objections to a motion for summary judgment, "[o]bjections such as lack of foundation, speculation, hearsay and relevance are duplicative of the summary judgment standard itself." *All Star*

*Seed v. Nationwide Agribusiness Ins. Co.*, No. 12CV146 L BLM, 2014 WL 1286561, at *16–17 (S.D. Cal. Mar. 31, 2014) (citing *Burch*, 433 F. Supp. 2d at 1119–20).

Scripps asserts in its Opposition that a statement by Linda Seibert during her deposition is hearsay. (Doc. No. 135 at 33.) Specifically, Scripps objects to the following statement: "And because the site did not have an engineering director for some time and the techs were sort of doing this on their own without supervision, *we - - we were advised that some of this work may have been deferred*." (Deposition of Linda Seibert ("Seibert Depo."), Doc. No. 132-55, at 19–20 (emphasis added).)

Nautilus responds that Ms. Seibert's deposition testimony as a 30(b)(6) witness confirmed the meaning of her testimony and, therefore, her statement is not hearsay under Federal Rule of Evidence 801(d)(1) as a declarant-witness's prior statement and 801(d)(2) as an opposing party's statement. (Doc. No. 137 at 29.) Nautilus further asserts her statement is also corroborated by other Scripps employees in the engineering department and the substandard condition of the HVAC. (*Id.*)

The Court **OVERRULES** Scripps' hearsay objection pursuant to Federal Rule of Evidence 801(d)(2), which provides that an admission by a party-opponent is not hearsay. An admission by a party-opponent includes statements "made by a person whom the party authorized to make a statement on the subject[,]" Fed. R. Evid. 801(d)(2)(C), and those "by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship[,]" Fed. R. Evid. 801(d)(2)(D).

## V.    DISCUSSION

Nautilus moves for summary judgment on all causes of action based on Scripps' alleged breach of its express warranty in the Application, which was incorporated into the Policy, to strictly follow its preventative maintenance protocols, and its breach of the notice provisions, both of which were conditions precedent to coverage. (Doc. No. 132 at 1–2.) Nautilus moves in the alternative for partial summary judgment on the following issues: (1) no coverage for cleanup costs for 24 AHUs and downstream ductwork that were remediated before a pollution condition (i.e. mold) was established by a CIH and mold

testing; (2) no coverage for mold first discovered in the ductwork for AHU-4, AHU-5, and AHU-12 after the Nautilus Policy expired; (3) four self-insured retentions apply to Scripps' mold claim; (4) Scripps' claim for breach of the covenant of good faith and fair dealing is barred by the genuine dispute doctrine; and (5) Scripps' punitive damages claim fails as a matter of law because there is no evidence of bad faith, malice, oppression, or fraud. (*Id.* at 2.)

Scripps in turn seeks partial summary judgment findings that (1) Nautilus' Nineteenth Affirmative Defense based on contributory negligence fails as a matter of law because it is inconsistent with California Insurance Code Section 533 and binding precedent; (2) with respect to Nautilus' Third Affirmative Defense, the operative version of Exclusion 11 is that contained within an endorsement based on a reasonable interpretation of the Policy's language; and (3) Nautilus' Thirteenth Affirmative Defense fails as a matter of law because, reading the Policy as a whole, a reasonable interpretation is that none of the statements of future intent contained within the Chubb Application is a warranty that operates as a condition precedent to coverage. (Doc. No. 135 at 11–12.)

## A.    Scripps' Duty to Follow Its HVAC Preventative Maintenance Protocols

Because Nautilus' motion for summary judgment based on Scripps' failure to strictly follow its preventative maintenance protocols and Scripps' motion for partial summary judgment based on Nautilus' Thirteenth Affirmative Defense raise overlapping arguments, the Court addresses these together.

Nautilus first asserts Scripps breached its warranty to strictly follow its HVAC preventative maintenance protocols, which is a complete defense to coverage for Scripps' mold claim. (Doc. No. 132-1 at 25.) Nautilus argues Scripps made a promissory warranty that it would "strictly follow" all maintenance protocols designed to prevent mold growth. (*Id.* (citing Chubb Application at 8; Cal. Ins. Code § 445; and *McKenzie v. Scottish Union & Nat'l Ins. Co.*, 112 Cal. 548, 555 (1896) ("An express warranty is a stipulation inserted in writing on the face of the policy, on the literal truth or fulfillment of which the validity of the entire contract depends.")).) Nautilus further asserts that since litigating this dispute,

it has discovered substantial evidence that Scripps was not following its HVAC preventative maintenance protocols and was deferring maintenance of its HVAC systems leading to a build-up of mold. (Doc. No. 132-1 at 26.)

### 1.    Whether Compliance Was a Condition Precedent to Coverage

"A statement in an insurance policy importing an intention to do or not to do a thing which materially affects the risk is a warranty that such act or omission will take place." *Chase v. Nat'l Indem. Co.*, 129 Cal. App. 2d 853, 858 (1954) (citing Cal. Ins. Code § 445). A warranty may relate to the past, the present, the future, or to any or all of these. Cal. Ins. Code § 444. "Generally speaking, compliance with the terms of a warranty is a condition precedent to a right of recovery." *Chase*, 129 Cal. App. 2d at 858 (citing *De Campos v. State Comp. Ins. Fund*, 122 Cal. App. 2d 519, 530 (1954)).

"'A condition *precedent* refers to an act, condition or event that must occur before the insurance contract becomes effective or binding on the parties . . . .' In general, 'conditions neither confer nor exclude coverage for a particular risk but, rather, impose certain duties on the insured in order to obtain the coverage provided by the policy.'" *N. Am. Capacity Ins. Co. v. Claremont Liab. Ins. Co.*, 177 Cal. App. 4th 272, 289–90 (2009) (citations omitted).

First, Scripps argues in its motion for partial summary judgment that the law disfavors conditions precedent to coverage and cites several cases for this proposition. (Doc. No. 135 at 20.) For example, one case from the Southern District of California noted, "conditions precedent are not favored and courts will not construe contract terms as conditions unless required to do so by plain, unambiguous language." *Ins. Co. of the W. v. JPMorgan Chase Bank*, No. 08-CV-1492-JLS (CAB), 2008 WL 11508652, at *2 (S.D. Cal. Oct. 28, 2008) (quoting *Vogt-Nem, Inc. v. M/V Tramper*, 263 F. Supp. 2d 1226, 1232 (N.D. Cal. 2002)) (internal quotation marks omitted). However, Nautilus notes, and the Court agrees, that these cases either interpret standard policy provisions that are not an express warranty, or are not factually analogous. (Doc. No. 137 at 21); *see GE RealProp, LP v. Seneca Ins. Co.*, No. CV 20-4430-DMG (SKx), 2021 WL 1558936, at *6 (C.D. Cal.

15

Jan. 13, 2021) (appraisal provision in policy containing permissive language was not a condition precedent); *Ins. Co. of the W.*, 2008 WL 11508652, at *2 (whether the "terms and conditions" of a separate contract created a condition precedent to performance under a surety bond); *O'Connor v. Grand Lodge A.O.U.W. of Cal.*, 146 Cal. 484, 490–91 (1905) (allegedly false statements made to a medical examiner for life insurance were not considered warranties, "although so denominated").

Scripps also attempts to distinguish the cases cited by Nautilus for the proposition that a promissory warranty is an agreement in the form of a condition precedent. (Doc. No. 135 at 27–30.) Specifically, it argues that unlike the cases cited, the Policy language is not reasonably construed as requiring compliance with any of the Purported Warranties as a condition precedent to coverage, and no advisement was provided to Scripps. (*Id.* at 28.) However, courts in California have held that "[g]enerally, compliance with terms of a warranty is a condition precedent to recovery on the policy." *All Start Seed v. Nationwide Agribusiness Ins. Co.*, No. 12cv146 L(BLM), 2014 WL 1286561, at *6 (S.D. Cal. Mar. 31, 2014) (citing *Chase*, 129 Cal. App. 2d at 858); *see Trishan Air, Inc. v. Fed. Ins. Co.*, 635 F.3d 422, 428 (9th Cir. 2011); *Navigators Specialty Ins. Co. v. Leal*, No. EDCV 11-01049 VAP (DTBx), 2012 WL 13014629, at *5 (C.D. Cal. Aug. 29, 2012) ("Compliance [with the warranties] is a condition precedent to coverage under the Policy."). Scripps has failed to cite any case law for a differing proposition. Thus, the Court follows this line of cases that "[g]enerally, compliance with the terms of a warranty is a condition precedent to recovery on the policy."

Scripps further asserts Nautilus cannot meet its burden of proving the existence of a condition to comply with the Purported Warranty. (Doc. No. 135 at 21–22.) In support of this argument, Scripps points to various provisions of the Policy which clearly and unambiguously create certain conditions precedent to coverage. For example, the Policy uses the following phrases in relation to provisions unrelated to the instant suit:

- "provided that all of the following requirements must be satisfied for coverage to apply[;]" (Policy at 34);

16

- "provided that all of the following conditions are satisfied[;]" (*id.* at 46);
- "It is a condition precedent to coverage under this policy[;]" (*id.* at 76);
- "provided that: All of the following requirements must be satisfied for Coverage B to apply[.]" (*id.* at 78).

The Policy also advises that Scripps "must notify" Nautilus of certain matters and "[i]f such notice . . . is not provided to us, the covered location . . . shall be deemed to no longer be a covered location under the policy[.]" (*Id.* at 55.) Scripps argues that despite this clear and unambiguous language, the Policy is silent as to whether compliance with application statements regarding future intent to perform is a condition to coverage. (Doc. No. 135 at 22.)

However, Scripps' argument that the Policy does not clearly and unambiguously advise that compliance with the Purported Warranty is a condition precedent to coverage is belied by the Chubb Application. Indeed, the Chubb Application states:

> **BY SIGNING THIS APPLICATION, <u>THE APPLICANT WARRANTS TO THE INSURER</u> THAT IT AND THE OTHER PARTIES TO THIS INSURANCE WILL STRICTLY FOLLOW ANY WATER INTRUSION, MOLD-RELATED, FUNGI-RELATED, OR BACTERIA-RELATED OPERATION AND MAINTENANCE PROCEDURES OR PROTOCOLS, INCLUDING ANY WATER INTRUSION, MOLD-RELATED, FUNGI-RELATED OR BACTERIA-RELATED DUE DILIGENCE PROCEDURES OR PROTOCOLS (the "Purported Warranty") . . . . THE APPLICANT ACKNOWLEDGES THAT THE INSURER'S AGREEMENT TO PROVIDE MOLD, FUNGI AND/OR LEGIONELLA PNEUMOPHILA COVERAGE AS PART OF THE COVERAGE APPLIED FOR PURSUANT TO THIS APPLICATION <u>IS PREDICATED UPON</u> THE APPLICANT'S AGREEMENT TO PROVIDE THIS WARRANTY.**

(Chubb Application at 8 (underlined emphasis added).)  Additionally, the Policy provides:

> The application and supplemental materials and information submitted therewith, are the basis of this policy and are incorporated into and constitute a part of this policy. Any materials and information received in application for the policy will be maintained on file with the Company and shall be deemed to be attached to the policy as if physically attached. It is agreed by all insureds that the statements in the application and supplemental materials are

17

representations made on behalf of all insureds, that they are material, and that this policy is issued by the Company in reliance upon the truth of such representations. The policy includes all of the agreements existing between the insureds and the Company or any of its agents relating to this policy.

(Policy at 7.)

Scripps also points to a provision immediately above the Purported Warranty, which states:

> ***IT IS UNDERSTOOD AND AGREED THAT IF ANY SUCH CLAIMS EXIST, OR ANY SUCH FACTS OR CIRCUMSTANCES EXIST WHICH COULD GIVE RISE TO A CLAIM, THEN THOSE CLAIMS AND ANY OTHER CLAIMS ARISING FROM SUCH FACTS OR CIRCUMSTANCES ARE EXCLUDED FROM THE PROPOSED INSURANCE UNLESS OTHERWISE AFFIRMATIVELY STATED IN THE POLICY***.

(Chubb Application at 8.)  Scripps asserts the Chubb Application's failure to provide the consequences of the failure to comply with the Purported Warranties is notable. (Doc. No. 135 at 23.) To this, Nautilus explains this provision was related to Question 31 inquiring about any previous indoor air quality issues, and is an exclusion that precludes coverage for preexisting claims or conditions that could give rise to a claim that existed at the time the Policy was issued, and not a warranty. (Doc. No. 137 at 22.) Moreover, Scripps fails to cite any case law for the proposition that a warranty in the form of a condition precedent is ambiguous or unenforceable because it does not provide the consequences of the failure to comply with the warranty.

Scripps additionally argues Nautilus only allowed Scripps to sign and submit the Chubb Application as an accommodation to Scripps, and was willing to issue the Policy without the benefit of the Purported Warranty because its own application did not contain any similar provisions. (Doc. No. 135 at 19–20, 24–25, 30–31.) However, this does not detract from the fact that Scripps knowingly and willingly agreed to and signed the Chubb Application, which was incorporated into the Policy.

18

## 2.    Whether Strict or Substantial Compliance Is Required

Under California law, courts require either "substantial compliance" or "strict compliance" with warranties. *Trishan Air*, 635 F.3d at 427–30 (reviewing cases). "California Courts of Appeal have . . . articulated the necessity of strict compliance with warranties." *Id.* at 428 (citing *Chase*, 129 Cal. App. 2d at 858 ("A statement in an insurance policy importing an intention to do or not to do a thing which materially affects the risk is a warranty that such act or omission will take place. . . . Generally speaking, compliance with the terms of a warranty is a condition precedent to a right of recovery.") (citations omitted); *De Campos*, 122 Cal. App. 2d at 530 (holding that the insured's failure to comply with an affirmative warranty precluded reimbursement because "[c]ompliance with the terms of this warranty is a condition precedent to a right of recovery insofar as this particular risk is concerned. Noncompliance defeats recovery.") (citation omitted); and *Finkbohner v. Glens Falls Ins. Co. of Glens Falls, New York*, 6 Cal. App. 379, 387 (1907)). Moreover, the Ninth Circuit has opined that strict compliance would apply regarding "warranties premised on the underlying risk." *Id.* at 431.

California courts oftentimes apply the substantial compliance standard regarding promissory warranties of certain recordkeeping tasks. *Id.* Under the substantial compliance standard, if any noncompliance by the insured was "minor and the insured complied with at least some of the specific requirements at issue" the standard is met. *Id.* at 432. However, "California courts have rejected substantial compliance arguments where the insured completely failed to comply with a warranty or condition." *Id.* (citing *Abdelhamid v. Fire Ins. Exch.*, 182 Cal. App. 4th 990, 1000 (2010), and *S&M Lamp Co. v. Lumbermens Mut. Cas. Co.*, 199 Cal. App. 2d 446, 453 (1962), *as modified*).

Scripps argues a strict compliance standard is not warranted here because "compliance involves the performance of tens of thousands of tasks." (Doc. No. 135 at 31.) Scripps asserts that no California court has opined that strict compliance is required under similar circumstances. (*Id.* at 31–32.) To this point, Scripps "submits that, under these particular circumstances, the California Supreme Court would either apply a substantial

19

compliance standard or would hold that strict compliance is something other than 100% compliance." (*Id.* at 32.) However, Scripps fails to cite any case law in support of its proposition that the substantial compliance standard should apply here.

Nautilus responds that not only does the warranty expressly require Scripps to "strictly follow" mold-related maintenance protocols, but California law interprets the warranty as a condition precedent to require strict compliance. (Doc. No. 137 at 30.) In *Trishan Air*, the Ninth Circuit observed "a notable paucity of recent California Supreme Court precedent concerning an insured's strict compliance with insurance warranties" but remarked that "the California Supreme Court has held that strict compliance may be required." 635 F.3d at 427. The Ninth Circuit further noted that "California Courts of Appeal have . . . articulated the necessity of strict compliance with warranties. . . . [and] [t]hus, California courts have recognized that insurance warranties require strict compliance to invoke coverage." *Id.* at 428 (citing *Chase*, 129 Cal. App. 2d at 858; *De Campos*, 122 Cal. App. 2d at 530; and *Finkbohner*, 6 Cal App. at 387). The *Trishan Air* court thus applied the strict compliance standard to pilot warranties because they "serve[] as a necessary corollary of aviation insurance policies." *Id.* The court rejected the plaintiff's request to apply the substantial compliance standard, and noted the substantial compliance standard is oftentimes applied to recordkeeping requirements of a warranty. *Id.* at 431. "Thus, it does not follow that application of the substantial compliance doctrine regarding recordkeeping implicates compliance with warranties premised on the underlying risk." *Id.*

The Court applies the strict compliance standard because the warranty to follow preventative maintenance protocols goes to the fundamental risk covered, *i.e.*, maintaining the HVAC and water utilities to prevent mold. This is in line with *Trishan Air*, where the Ninth Circuit held the strict compliance standard applied to pilot warranties because they "serve[] as a necessary corollary of aviation insurance policies." Moreover, as asserted by Nautilus, Scripps confuses the warranty with a mere condition in the Policy, which would require only substantial compliance. As observed by *Trishan Air*, "[t]his argument ignores the dichotomy between conditions relating to basic coverage, such as notice provisions,

and conditions, like the pilot warranty, that are 'an element of the fundamental risk insured.'" *Trishan Air*, 635 F.3d at 428 (quoting *Root v. Am. Equity Specialty Ins. Co.*, 130 Cal. App. 4th 926, 943 (2005)).

Finally, Scripps asserts it never claimed compliance with American Society of Heating, Refrigerating, and Air-Conditioning Engineers ("ASHRAE") standards in connection with its Application. (Doc. No. 135 at 32.) In response, Nautilus asserts the UWSMP incorporated other HVAC regulatory standards, including ASHRAE standards. (Doc. No. 137 at 24 (citing Doc. No. 132-15 at 86).) Indeed, the UWSMP states:

> The policies and tasks noted herein do not describe all preventative maintenance actions that the Scripps Green Hospital performs as part of routine maintenance at the facility. It is a consolidation of tasks and policies that are specifically implemented to control *Legionella* and other waterborne pathogens, and is in support of . . . the *ANSI/ASHRAE Standard 188-2015, Legionellosis: Risk Management for Building Water Systems*[.]

(Doc. No. 132-15 at 5.) Moreover, Scripps' Operations Director, Raydel Gomez, testified that Scripps follows ASHRAE "if [the standards] vary with the manufacturers[.]" (Gomez Depo. at 3.) Because Scripps does not reply to this argument or present any evidence supporting an adverse inference, and Nautilus has presented evidence that ASHRAE standards were incorporated into the UWSMP, the Court finds Scripps was also bound to comply with ASHRAE standards.

### 3. Scripps' Compliance with the Purported Warranty

Scripps argues that regardless of the appropriate standard, Nautilus has failed to demonstrate a genuine, material factual dispute as to whether Scripps complied with its maintenance procedures. (Doc. No. 135 at 32.) Nautilus responds that summary judgment is proper because Scripps did not comply with any aspect of the Purported Warranty. (Doc. No. 137 at 32.)

In support of its motion, Nautilus points to an email sent by Ms. Seibert, in which she stated, "I believe that Scripps also may have some liability in that we have procedures to visually inspect the HVAC system on a certain schedule and some of those inspections

were deferred, which may also have contributed to the pollution condition[.]" (Doc. No. 132-53 at 2.) When asked during deposition why she believed Scripps had liability, Ms. Seibert explained:

> It's pretty much stated there that we have policies and procedures to - - in place to perform preventative maintenance on certain schedules. And because the site did not have an engineering director for some time and the techs were sort of doing this on their own without supervision, we - - we were advised that some of this work may have been deferred.

(Seibert Depo. at 19–20.)  Scripps argues that the fact that some work "may" have been deferred is insufficient to establish the deferral of the protocol. (Doc. No. 135 at 33.)

Nautilus further contends that after it completed fact discovery in this case, it discovered pleadings and declarations in a wrongful termination case brought by former Scripps employee Clarence Jones against Scripps in which Scripps witnesses submitted declarations "admitting that its engineering department managing HVAC maintenance was in complete disarray leading up to this claim and that employees were not following maintenance protocols." (Doc. No. 132-1 at 26.) For example, Ms. Pickett provided a declaration on July 8, 2021, in *Jones v. Scripps Health*, Case No. 37-2020-00016806-CU-WT-CTL, stating:

> [T]he Scripps Green Hospital air handlers had not been properly maintained for at least a year, if not longer. This preventative maintenance work for the air handlers had been marked "completed" in the department's preventative maintenance/work order system, but the Engineering Supervisor Clarence Jones had failed to ensure the preventative maintenance had been completed by his subordinates. As a result, the air handler system at Scripps Green Hospital had mold growing in it and was in need of extensive remediation by the time I stepped into my new role [in early January 2020].

(Declaration of Tina Pickett in *Jones v. Scripps Health*, Doc. No. 132-6, ¶ 7.)

Former Scripps employee Chris Hubbard also provided a declaration in the *Jones* case. Mr. Hubbard was employed in the Scripps Green Engineering Department from 2015 to 2019 as the primary HVAC technician. (Declaration of Chris Hubbard in *Jones v.*

22

*Scripps Health*, Doc. No. 132-6, ¶ 2.) He stated that "[b]ecause of the serious understaffing at Scripps Green, we had problems finishing our PMs [preventative maintenance] throughout 2019. . . . We had around 600 PMs a month and not enough staff to do them." (*Id.* ¶ 4.) Another former Scripps employee, Marcia Wylie, stated that Mr. Jones' failure to report growth and discoloration in the AHUs to department leadership "put patient safety at risk by not taking urgent steps to remediate the issues himself." (Declaration of Marcia Wylie in *Jones v. Scripps Health*, Doc. No. 132-6, ¶ 9.)

Scripps first argues the Pickett PowerPoint and Ms. Pickett's subsequent deposition do not support Nautilus' contention that Scripps' maintenance protocols were not being followed. (Doc. No. 135 at 33.) Scripps first points to Ms. Pickett's deposition, in which she stated, "[t]his PowerPoint was to give an overview of the activities we did around the HVAC system at Scripps Green *and Scripps Health*." (Pickett Depo. at 3–4 (emphasis added).) However, the PowerPoint page at issue specifically stated that it pertained to the "Green Campus," and other pages within the PowerPoint also specifically denote when discussing Scripps Health or all Scripps campuses. (*See* Doc. No. 132-46 at 8–10.)

Scripps further asserts the statements that the facilities team "identified an issue with maintenance of air handlers" and "engineers had deferred maintenance on reports" without further details is insufficient to establish that Scripps was not complying with maintenance protocols. (Doc. No. 135 at 33.) Ms. Pickett testified that the maintenance issues she referred to in the PowerPoint "was the filters - - some of the filters were damaged, needed to be changed and that we saw debris on the air handler units." (Pickett Depo. at 6.) Scripps asserts this is reasonably interpreted as a statement that the filters needed to be changed because they were damaged, and not for lack of timely replacement pursuant to protocol. (Doc. No. 135 at 33.) Ms. Pickett further testified that another issue related to the maintenance of the air handler units was they "needed cleaning and service[.]" (Pickett Depo. at 7.) Scripps asserts these statements are "a far cry from suggesting they needed cleaning and service because they had not been cleaned and serviced pursuant to schedule." (Doc. No. 135 at 33.)

Nautilus also contends the condition of AHUs observed by SD Tech was not consistent with the implementation of an ongoing preventative maintenance program. (Doc. No. 132-1 at 26 (citing Nunez Depo. at 7–8).) Scripps disagrees with this portrayal of Mr. Nunez's testimony, which proceeded as follows:

> Q.    But, I mean, would you expect AHUs that are regularly maintained, like all 40 of them, to have growth and discoloration if they were being well maintained?
>
> . . .
>
> A.    I mean, that's not the condition you would want to have your air handling units in, especially if you do have a preventative maintenance cleaning program.

(Nunez Depo. at 7–8.)  Nautilus' HVAC expert, Joseph Palanca, P.E., further concluded that the ongoing excessive moisture and dirt resulting in "growth and discoloration" in all 40 AHUs on the Scripps Green campus in 2019 and mold in 14 AHUs as confirmed by FACS was caused by prolonged deferred maintenance. (Palanca Decl. ¶¶ 5, 6.) Mr. Palanca noted that the "discovery of mold was not localized to a certain area of the campus. The widespread incidence of mold is indicative of systemic operational issues in all AHUs at all four buildings resulting from deferred maintenance and failure to follow preventative maintenance protocols." (*Id.* ¶ 6; *see also* Doc. No. 132-17 (site inspection exemplar photos).)

Despite Scripps' assertions that Nautilus' evidence fails to pass muster, it has not submitted evidence contradicting or disputing this evidence. Nor has Scripps submitted evidence that it strictly—or substantially—complied with its maintenance protocols. Thus, based on the foregoing, the Court **DENIES** Scripps' partial motion for summary judgment as to Nautilus' Thirteenth Affirmative Defense and **GRANTS** Nautilus' motion for summary judgment as to all claims.

///

///

24

**B.    Late Notice**

Even if the Court were to find that Scripps strictly complied with its maintenance protocols, Nautilus asserts Scripps' late notice defeats coverage. (Doc. No. 132-1 at 28.) Specifically, the Policy at Section III states that Scripps "must see to it that we are notified **as soon as possible** after an insured first becomes aware of a pollution condition which may result in cleanup costs." (Policy at 12 (emphasis added).) The Policy further requires under the section entitled "Voluntary Payments" that in the event that Scripps incurs emergency expenses, it must "provide notice to the Company within ten (10) days of the first commencement of the pollution condition for which the emergency expenses have been incurred." (*Id.* at 13.) Nautilus asserts Scripps did neither, and that Nautilus reserved the defense of late notice in its March 26, 2020 reservation of rights letter. (Doc. No. 132-1 at 28 (citing Doc. No. 132-22).) Nautilus asserts this late notice of Scripps' claim substantially prejudiced Nautilus as a matter of law because it was unable to investigate this claim before Scripps remediated over 50% of the AHUs. (*Id.* at 30.) Scripps responds that Nautilus' position is misplaced because it reported within the policy period and within weeks of risk management becoming aware of the pollution condition, and because Nautilus cites the wrong provision of the Policy, provides no basis for requiring strict compliance, and genuine issues of material fact exist. (Doc. No. 135 at 34.)

The Joint Commission Report and Timeline shows that between May 30, 2019, and December 19, 2019, Scripps conducted extensive activity related to the inspection, internal reporting to Scripps senior management, and remediation of the entire HVAC system at Scripps Green. (*See* Doc. No. 132-20 at 9–14.) Additionally, Scripps notified multiple other entities about the "growth and discoloration" in 40 AHUs, including ATI, SD Tech, Countywide Plumbing and Maintenance, and The Joint Commission. (*See id.*) Scripps thereafter submitted its claim to Nautilus on February 18, 2020. (*See* Doc. No. 132-21.) Counting from the initial complaint of odor on May 30, 2019, Nautilus asserts Scripps waited eight months to notify Nautilus. (Doc. No. 132-1 at 29.) Nautilus further argues there is no explanation as to why Scripps did not provide earlier notice other than that

Scripps' Risk Manager was unaware of the policy notice provisions. (*Id.* (citing Seibert Depo. at 4–8).) Indeed, during deposition, Ms. Seibert stated, "[a]t the time that SD Tech began their work, this policy was not reviewed or this section about 'Voluntary Payments' because Risk and Insurance was unaware that this work was occurring or that we were going to make a claim against this policy." (Seibert Depo. at 9.)

As a preliminary matter, Scripps asserts the "as soon as possible" language found in the Policy is deleted and replaced by Section VII of the Endorsement, which imposes a duty to report "as soon as practicable" after a responsible insured becomes aware of a pollution condition. (Doc. No. 135 at 34 (citing Doc. No. 135-10 at 26).) Specifically, Scripps asserts that because Nautilus did not use the phrase "solely with respect to the coverage provided by this endorsement" in Section VII, it is reasonable to read Section VII as replacing the notification provision at Section III for all purposes. (*Id.*) Nautilus responds that regardless of which Reporting Provision applies, and regardless of which of the "as soon as possible" or "as soon as practicable" standards applies, Scripps did not provide timely notice. (Doc. No. 137 at 35.) Further, Nautilus argues Scripps ignores the policy language requiring "notice as soon as possible" and notice of an emergency within 10 days. (*Id.*) Because Nautilus does not make any substantive arguments as to whether the "as soon as possible" language applies, the Court applies the "as soon as practicable" standard found within Section VII of the Endorsement (Policy at 36), and the "within ten (10) days" of an emergency language found in both Section III of the Main Form and Section VII of the Endorsement (*id.* at 13, 37). Scripps does not address the Policy's language requiring notice of an emergency within 10 days. (*See* Doc. No. 135 at 34–37.)

### 1.    "Claims-Made-and-Reported" Policies

Professional liability insurance policies generally fall into one of two categories: "occurrence" policies and "claims-made" policies. *Pac. Emps. Ins. Co. v. Superior Ct.*, 221 Cal. App. 3d 1348, 1356 (1990). "Occurrence" policies provide coverage for events that take place during the policy period "even if they lead to claims years after the policy period[.]" *Pension Trust Fund for Operating Eng'rs v. Fed. Ins. Co.*, 307 F.3d 944, 955

(9th Cir. 2002). "Claims-made" policies provide coverage for claims that are "made within the policy period, regardless of when the events that caused the claim to materialize first occurred." *Id.* (citing *Burns v. Int'l Ins. Co.*, 929 F.2d 1422, 1424 n.3 (9th Cir. 1991)); *Pac. Emps.*, 221 Cal. App. 3d at 1356–57.

"Claims-made policies can be further classified as either claims-made-and-reported policies, which require that claims be reported within the policy period, or general claims-made policies, which contain no such reporting requirement." *Operating Eng'rs*, 307 F.3d at 955 (emphasis omitted).

Here, it is undisputed that the Policy is a "claims-made-and-reported" policy. (*See* Doc. No. 132-1 at 28; Doc. No. 135 at 34.)

### 2. Notice-Prejudice Rule

Developed in the context of "occurrence" policies, the notice-prejudice rule "bar[s] insurance companies from disavowing coverage on the basis of lack of timely notice unless the insurance company can show actual prejudice from the delay." *Pac. Emps.*, 221 Cal. App. 3d at 1357. The rule has been extended to general "claims-made" policies. *See Operating Eng'rs*, 307 F.3d at 956–57; *Colony Ins. Co. v. Thomas*, NO. CV 10–04218 MMM (SHx), 2011 WL 13109255, at *8 (C.D. Cal. Jan. 24, 2011) ("Where a policy does not require that claims be reported within the policy period or some specified period of time thereafter, California's 'notice-prejudice' rule applies.").

In "claims-made-and-reported" policies, however, a majority of California courts have declined to apply the notice-prejudice rule, reasoning that to do so "would materially alter the insurer's risk." *Helfand v. Nat'l Union Fire Ins. Co.*, 10 Cal. App. 4th 869, 888 (1992); *see WorldWater & Power Corp. v. Genesis Ins. Co.*, No. 07cv0026 DMS (RBB), 2007 WL 9776733, at *2 (S.D. Cal. May 1, 2007) (listing cases). The Ninth Circuit has also adopted this majority approach. *See Burns v. Int'l Ins. Co.*, 929 F.2d 1422 (9th Cir. 1991). Courts have declined to apply the notice-prejudice rule even in cases where the plaintiff gave notice to the insurer within the policy period, but outside the period provided in the policy's notice provision. *See WorldWater & Power*, 2007 WL 9776733, at *3.

27

Scripps argues "California courts have not specifically considered whether the 'prejudice' standard typically applied to a 'prompt notice' provision applies when the policy is a claims-made-and-reported one or whether a strict compliance standard is warranted despite notice being given during the policy period. But it is fair to assume the California Supreme Court would require an insurer to demonstrate prejudice." (Doc. No. 135 at 35.) Scripps cites *Pitzer College v. Indian Harbor Inc. Co.*, 8 Cal. 5th 93 (2019), arguing the notice-prejudice rule "protect[s] insurers from prejudice" but is not intended "'to shield them from their contractual obligations' through 'a technical escape-hatch.'" 8 Cal. 5th at 105. However, the *Pitzer College* court analyzed whether California's notice-prejudice rule applied to the policy before it in the context of an occurrence policy, rather than a claims-made-and-reported policy. *Id.* at 107–08. Additionally, the cases further cited by Scripps are not binding on this Court and are inconsistent with California law. *See Prodigy Commc'ns Corp. v. Agric. Excess & Surplus Ins. Co.*, 288 S.W.3d 374, 375 (Tex. 2009); *TRT Dev. Co., Inc. v. ACE Am. Ins. Co.*, 566 F. Supp. 3d 118, 121 (D.N.H. 2021); *Gen. Star Indem. Co. v. Guthrie*, No. 19-cv-314-JWB, 2022 WL 4088066, at *7 (E.D. Okla. Sept. 2, 2022).

The Court finds Scripps' argument unavailing, as California courts have clearly declined to apply the notice-prejudice rule on a "claims-made-and-reported" policy. Moreover, as noted above, the California Supreme Court has observed that "[a]n insurance company has the right to limit the coverage of a policy issued by it and when it has done so, the plain language of the limitation must be respected." *Nat'l Ins. Underwriters v. Carter*, 17 Cal. 3d 380, 386 (1976) (citation omitted); *see Windsor Food Quality Co., Ltd. v. Underwriters of Lloyds of London*, 234 Cal. App. 4th 1178, 1185 (2015) ("As an insurer, Lloyds is entitled to limit its coverage to defined risks and, if it does so in clear language, courts will not impose coverage where none was intended."). Indeed, "[c]ase law has yet to make a distinction between a claim reported within the policy period but outside of an additionally imposed time limit, and a claim reported outside of the policy period." *Centurion Med. Liab. Protective Risk Retention Grp. Inc. v. Gonzalez*, 296 F. Supp. 3d

1212, 1218 (C.D. Cal. 2017). Thus, because Nautilus clearly and inconspicuously noted that the insured is required to give notice of a pollution condition "as soon as practicable" and within 10 days of an emergency, this language controls.

Scripps also argues that prompt notice is not required because the Policy does not advise that prompt notice is a condition precedent to coverage. (Doc. No. 135 at 36.) However, courts have held that "the reporting requirement functions as a condition precedent to coverage, not as a definition of coverage." *Root*, 130 Cal. App. 4th at 946.

### 3. Timely Notice

Scripps argues Nautilus treated Scripps' claim as a report of a "potential" claim because a pollution condition had not been confirmed by a CIH. (Doc. No. 135 at 36 (citing Declaration of Linda Seibert ("Seibert Decl."), Doc. No. 135-3, ¶¶ 5–6).) The Court finds this argument disingenuous as Nautilus treated it as such because Scripps failed to follow the terms of the Policy, requiring that the pollution condition be confirmed by a CIH. (*See* Doc. No. 132-22, at 2.) Scripps cannot use its own deficiencies as a shield against liability.

Scripps finally argues that it filed its claim within weeks of Risk Management becoming aware of the matter, and thus there is a genuine issue as to whether notice was prompt. (Doc. No. 135 at 36.) The Court understands this argument to meant that Risk Management was the only "responsible insured" able to give notice of a pollution condition. (*See id.* at 13–17.) Here, Ms. Seibert, the Risk Manager, states she did not hear about the remediation of mold by SD Tech at Scripps Green campus until a January 2020 meeting, and thereafter submitted the claim in February 2020. (Seibert Decl. ¶¶ 5–6.) Thus, argues Scripps, genuine issues exist as to whether notice was prompt and reasonable under the circumstances. (*Id.*) As part of Scripps' motion for partial summary judgment, Scripps further argues that the Endorsement replaces Exclusion 11 of the Main Form, which requires the following: "You must see to it that we are notified as soon as practicable, after a **responsible insured** first becomes aware of . . . a pollution condition[.]" (Policy at 36.) As noted above, the Court understands this to mean Scripps asserts Ms. Seibert was the

only "responsible insured" able to give notice of a pollution condition. However, Scripps provides no further argument or evidence in support of this assertion.

Nautilus responds that Scripps' proffered definition of "responsible insured" in the Healthcare Endorsement as applied to the notice requirement also includes directors, officers, and partners. (Doc. No. 137 at 36.) Indeed, the Endorsement defines "responsible insured" as "employee(s) of the Corporate Risk Management or Legal Departments of Scripps Health, or any officer, director, or partner of any insured." (Policy at 44.) On August 28, 2019, a meeting was held with numerous Scripps Green employees from Engineering, Safety, Infection Control, Administration, Surgery, and Scripps' partner SD Tech to discuss remediation of the widespread mold in the AHUs, but no notice was provided to Nautilus under February 2020. (*Id.* (citing Doc. No. 132-20 at 11 (entry for 8/28/2019)).) However, the document on which Nautilus relies does not clarify whether any of these employees were officers, directors, or partners of Scripps Green. Thus, the Court finds genuine issues of material fact exist as to whether Scripps provided prompt notice from a "responsible insured."

Nautilus finally asserts Scripps failed to provide notice within ten days of an emergency under the Voluntary Payment provision of the Policy. (Doc. No. 132-1 at 28.) When Ms. Seibert was asked whether she would consider the work done by SD Tech to be an emergency, she replied, "Yes. I'm not - - I'm not really sure what constitutes an emergency, but we felt that it was in the - - that we needed to do this cleanup right away so that it preserved the patient and employee safety of those that were in that building or buildings." (Seibert Depo. at 10.) Because Scripps does not address this argument, the Court finds Scripps failed to provide notice within ten days of an emergency expense.

Based on the foregoing, the Court need not address Nautilus' remaining arguments as to its motion for partial summary judgment on the following issues: (1) whether there was coverage for cleanup costs for 24 AHUs and downstream ductwork that were remediated before a pollution condition was established by a CIH and mold testing; (2) whether there was coverage for mold first discovered in the ductwork for AHU-4,

30

AHU-5, and AHU-12 after the Policy expired; (3) whether four self-insured retentions apply to Scripps' mold claim; and (4) whether Scripps' claim for breach of the covenant of good faith and fair dealing is barred by the genuine dispute doctrine. (*See* Doc. No. 132-1 at 10.)

* * *

The Court has reviewed all evidence submitted in support of, and in opposition to, Plaintiff's Motion for Partial Summary Judgment. (Doc. Nos. 135, 137, 138.) To the extent this evidence has not been discussed above or is not duplicative of the evidence submitted in relation to Nautilus' Motion for Summary Judgment, the Court finds it does not alter the conclusions reached above. For the reasons discussed above, Scripps has failed to demonstrate it is entitled to partial summary judgment as to its claims. Accordingly, Scripps' Motion for Partial Summary Judgment is **DENIED**.

## VI.    CONCLUSION

Based on the foregoing, the Court **GRANTS** Nautilus' motion for summary judgment and **DENIES** Scripps' motion for partial summary judgment. The Clerk of Court is **ORDERED TO CLOSE** the case.

**IT IS SO ORDERED.**

Dated:  November 20, 2024

Hon. Anthony J. Battaglia
United States District Judge